# IN THE COURT OF APPEALS OF IOWA

No. 14-0458
Filed July 22, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ALAN LEE LUCAS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.


        A defendant appeals his convictions for ongoing criminal conduct and theft in the first degree. **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Kevin Cmelik, Bridget A. Chambers, and Robert H. Sand, Assistant Attorneys General, Gerald Alan Vander Sanden, County Attorney, for appellee.


        Considered by Tabor, P.J., McDonald, J., and Sackett, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**SACKETT, S.J.**

Alan Lee Lucas appeals from the judgment entered following his convictions for ongoing criminal conduct and theft in the first degree. He contends the evidence is insufficient to support his convictions and his trial counsel was ineffective in several respects. Lucas also appeals his sentence, contending the court abused its discretion by improperly considering an unproven offense. After reviewing the issues raised, we affirm Lucas's convictions and sentence, but preserve two claims of ineffective assistance of counsel for a possible postconviction-relief proceeding.

## I. BACKGROUND FACTS AND PROCEEDINGS.

Covenant Investment Fund, L.P. (Covenant) is a hedge fund formed by Noah Auwles, who acted as the fund's general partner. It consists of a "family" of different funds, or what is known as "a fund of a fund." Some of Covenant's investors complained to the Iowa Insurance Commissioner about its poor performance. Auwles was advised to break up Covenant by liquidating each of the funds and distributing the money to the fund's investors. Auwles liquidated one of Covenant's funds, UltraSharp, before selling Covenant.

In May 2010, Auwles sold Covenant to Lucas for the purchase price of one dollar and Lucas's agreement to assume liability for a $62,540 debt Covenant owed. Lucas owned a number of shell corporations that were not profitable when he took control of Covenant. One of those corporations, Phalanx Technology Holdings, was about to be evicted from its office because it owed $9000 for rent.

When Lucas took control of Covenant, it had $189,000 in the bank from the UltraSharp liquidation. Although that money was supposed to be distributed to investors, Lucas had spent between $157,000 and $167,000 of that $189,000 within a year of assuming control of Covenant. Lucas used Covenant funds to pay the rent for Phalanx Technology Holdings, start-up expenses for a data center Lucas wanted to build, and the salary of the person hired to raise capital for the data center. Lucas also used Covenant funds to purchase a BMW for business and pay a number of personal expenses, including his wife's credit card debt and the property taxes on his personal residence.

The State filed a trial information charging Lucas with ongoing criminal conduct and first-degree theft on June 9, 2011.[1] Following a jury trial in October 2013, Lucas was convicted as charged. He was sentenced to a term of not more than ten years in prison on the first-degree theft conviction and a term not more than twenty-five years in prison on the ongoing criminal conduct conviction. The sentences were ordered to be served concurrently.

## II.   SUFFICIENCY OF THE EVIDENCE.

Lucas first contends there is insufficient evidence to support either of his convictions. We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). We will not disturb a finding of guilt if it is supported by substantial evidence when reviewing the record as a whole. *Id.* We view the evidence in the light most favorable to the State. *Id.* In order to be considered substantial, the evidence must be enough to

---

[1] A money laundering charge was later added and then dismissed.

convict a rational factfinder the defendant is guilty beyond a reasonable doubt. *Id.*

The jury was instructed that in order to convict Lucas of theft, the State was required to prove Lucas had possession of money owned by Covenant investors and intentionally misappropriated the money by disposing of it in a manner inconsistent with the owners' rights. The jury was further instructed that misappropriation occurs when

> a person, knowing he had no right or permission to do so, exercises control over property or aids a third person in exercising control, so that the benefit or value of the property is lost to the owner. Misappropriation may also occur when a person knowingly disposes of property for his own benefit or for the benefit of a third person.

However, the jury was also instructed on the claim-of-right defense, which states that "[a] person who disposes of property is not guilty of Theft if he reasonably believes he has a right, privilege, or permission to do so, or if he does in fact have such right, privilege or permission."

To be convicted of ongoing criminal conduct, the jury was instructed the State had to prove Lucas committed thefts on an ongoing basis for financial gain and those thefts were punishable as indictable offenses. In other words, the State was required to prove Lucas committed a number of thefts of property valued at more than $200 on an ongoing basis.

Lucas challenges both convictions on the basis the State cannot establish he committed one theft, let alone multiple thefts. He argues he had a right to the Covenant funds he spent. Specifically, he argues that as Covenant's general

partner, he was entitled to the money in the form of management fees and reimbursement for expenses.

### A. Management Fees.

Covenant investors were provided with a private placement memorandum (PPM) that outlines Covenant's general operating procedures. Under Article VI of the PPM, entitled "Fees and Expenses: Brokerage Practices," it states that "[i]n consideration for the provision of certain administrative services, the General Partner shall receive a management fee . . . equal to 1/4th of 2.00% per Fiscal Quarter of each Limited Partner's share of the Partnership's Net Asset Value." The management fee "shall be payable quarterly in advance and calculated as of the first day of each Fiscal Quarterly [sic]." Lucas claims the State failed to present any evidence of the partnership net asset value, and therefore, it cannot disprove he was entitled to spend the money as part of his management fees.

Lucas faults the State for failing to introduce evidence of the fund's value.[2] Because the State failed to prove its value, he argues it cannot prove he was not entitled to the money he spent from the fund, claiming they were management fees. We disagree. The evidence, viewed in the light most favorable to the State, shows Lucas was not entitled to management fees in the amount disposed of and did not have a reasonable belief that he was entitled to management fees in this amount.

---

[2] While Lucas attempts to construe the lack of evidence in the record as the State's failure of proof, we note that the PPM states Covenant's net asset value is to be determined by valuing all partnership assets and liabilities on the last day of each month. The PPM tasks the general partner with the duty to keep true and complete records and books of account, and to prepare financial statements and all instruments to effectuate the business of the partnership.

The evidence shows Covenant's net asset value was unclear during the period Lucas was in control of it. Covenant's records were poorly kept before Lucas took control. Robyn Palmer testified that when Lucas first received the Covenant documents, "[i]t was a mess. Like I said, there were records scattered everywhere. Trying to figure out the flow of money, where it was coming, where it was going, who had invested, what their current balances were. There was very incomplete information." Lucas hired Palmer "to piece together exactly what it was we had" in the fund. She worked for Lucas for approximately four months before quitting over concerns about how he was handling the money. When Palmer quit on September 10, 2010, the results of her investigation into where the money had gone and how much money was within the various funds remained "inconclusive."

Lucas was not entitled to the money he spent as management fees. Lucas was unaware of the Covenant's net asset value from May 2010 until at least September 10, 2010. While he had no basis upon which to calculate his management fees paid during this period, he spent over $35,000 in Covenant funds during the same period, making twenty-five withdrawals of more than $200 from Covenant's bank account. These withdrawals include the initial $9000 payment for the rent Phalanx Technology Holdings owed for office space, plus two additional payments of $3300 to the same lessor. Lucas also paid over $2000 in personal property taxes from the account during this period and made a $4881.80 payment on his wife's Discover card.

The evidence of Lucas's behavior shows Lucas also lacked a good-faith belief he was entitled to the money. Lucas moved money between eleven bank accounts and gave false or misleading testimony at an administrative hearing with regard to how the funds were used. One of the fund's investors testified Lucas had falsely informed him the State had taken control of Covenant's funds and was working to distribute them during a period when Lucas was still in control of the funds. These actions indicate Lucas knew he had no right or permission to the use the funds.

## B. Reimbursement for Expenses.

Lucas also contends the State cannot prove he misappropriated any partnership money he was legally entitled to as reimbursement of operating expense and liquidation expenses. Under section 6.02(b), entitled "Operating Expenses," the PPM states:

> The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or their affiliates for (A) all expenses incurred in connection with the ongoing offer and sale of Interests, including but not limited to, marketing expenses, documentation of performance and the admission of Limited Partners, (B) all operating expenses of the Partnership such as tax preparation fees, governmental fees and taxes, administrator fees, communications with Limited Partners and ongoing legal, accounting, auditing, bookkeeping, insurance, consulting and other professional fees and expenses, (C) all Partnership trading costs and expenses (e.g., brokerage commissions, margin interest, expenses related to short sales, custodial fees and clear and settlement charges), (D) professional and other advisory and consulting expenses and travel expenses incurred in connection with investment due diligence, monitoring or the assertion of rights or pursuit of remedies (including without limitation, pursuant to bankruptcy or other legal proceedings, or participation in informal committees or creditors or other security holders of an issuer), (E) external data services (including, but not limited to, bond pricing and rating data feed) and software expenses including in identifying

and monitoring investment opportunities, and (F) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims by or against the Partnership.

However, the PPM also provides that the General Partner pay the "general operating and overhead type expenses associated with providing the administrative and investment management services required under the Partnership Agreement," including "all expenses incurred by the General Partner in providing for its normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, insurance, utilities, telephone, secretarial and bookkeeping services, etc.)."

Payments for personal property taxes and personal credit card accounts cannot be reimbursed under the PPM. The PPM also explicitly states rent and other overhead costs are to be incurred by the general partner and are not reimbursable. Therefore, the specific expenditures discussed in subsection A were not reimbursable. Furthermore, as discussed in subsection A, Lucas's actions following his use of the funds indicate he knew he had no right to reimbursement from the fund for the purchases he made.

## C. Conclusion.

Substantial evidence shows Lucas intentionally misappropriated more than $10,000 of property to which he had no legal right. Substantial evidence also shows Lucas committed thefts of property valued more than $200 on an ongoing basis. Accordingly, we affirm his convictions of first-degree theft and ongoing criminal conduct.

### III.  INEFFECTIVE ASSISTANCE OF COUNSEL.

Lucas next contends he received ineffective assistance from his trial counsel.  He advances three ineffective-assistance claims on appeal: (1) trial counsel failed to object to questions regarding Lucas's credibility, (2) trial counsel failed to object when the prosecutor made improper argument in closing argument, and (3) trial counsel failed to object or to move to redact allegations of prior bad acts from his prior sworn testimony.

We review ineffective-assistance-of-counsel claims de novo.  *State v. Ross*, 845 N.W.2d 692, 697 (Iowa 2014).  A defendant wishing to succeed on such a claim must show counsel's performance was deficient and there is a reasonable probability that the outcome of the proceeding would have differed but for counsel's errors.  *Id.* at 697-98.  Typically, we preserve ineffective-assistance claims for postconviction relief proceedings, but we will address them on direct appeal where the record is adequate.  *State v. Bearse*, 748 N.W.2d 211, 214 (Iowa 2008).

### A.  Testimony Regarding the Defendant's Credibility.

Lucas first contends his trial counsel was ineffective in failing to object to incidents of alleged prosecutorial misconduct while examining witnesses.  Specifically, Lucas claims the prosecutor improperly asked witnesses to comment on his veracity or asked him to comment on another witness's testimony, as follows:

- In response to a line of questioning during cross-examination, the prosecutor asked Michael Ferjak, an investigator at the Iowa Attorney General's Office, if he believed Lucas's claim he had tried to recover assets for the fund's investors.  Ferjak replied, "I did not."

- One of the fund's investors, Alan Hanson, testified Lucas agreed the fund's money should be distributed to investors proportionately to their investment amounts. The prosecutor then asked, "But there was a but there?" and Hanson answered, "Yeah. I didn't believe him."
- Lucas's sworn testimony from an administrative hearing was admitted at trial. In it, Lucas was asked if another witness misspoke when describing who drafted a letter. Lucas's counsel objected, and Lucas did not answer the question. The transcript of the sworn testimony was admitted at trial, and Lucas's trial counsel failed to object or move for redaction of that portion of his statements.
- Kerry Bolt testified regarding the Covenant funds Luas spent and how they were used. When asked if Lucas's statement that on December 20, 2011, all of the money was still available was true, Bolt answered, "No, that was a false statement."

In *State v. Graves*, 668 N.W.2d 860, 873 (Iowa 2003), our supreme court held it is improper for a prosecutor to ask a defendant if another witness has lied. In reaching this conclusion, the court considered what purpose is served in asking a defendant whether another witness is lying:

> We think the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad . . . . The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other witness is lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer. If the defendant says a contradictory witness is not lying, then a fair inference is that the defendant is lying.

*Graves*, 668 N.W.2d at 872.

None of the instances of alleged prosecutorial misconduct noted above implicate the concerns noted by the *Graves* court. Lucas did not testify in his own defense, and therefore was never placed in the position of being asked if another witness was lying. In three of the four incidents, a witness testified regarding the truth or believability of an out-of-court statement made by Lucas,

which was relevant to the determination of whether Lucas knew he was using Covenant funds without the right to do so.

In the remaining incident, Lucas was questioned about a discrepancy between his statement and another witness's testimony. Specifically, he was asked if the other witness "misspoke." Although an objection to the question was sustained, Lucas argues the failure to redact the question poses the same concerns the court stated in *Graves*. We disagree. Asking a defendant if a witness who gives a contrary account is lying implies something different than asking if another witness misspoke. To lie is "to make an untrue statement with *intent* to deceive." *Lie*, Merriam-Webster, http://www.merriam-webster.com/dictionary/lie (last visited Jun. 10, 2015) (emphasis added). In contrast, to misspeak is "to express (oneself) imperfectly or incorrectly." *Misspeak*, Merriam-Webster, http://www.merriam-webster.com/dictionary/misspeak (last visited Jun. 10, 2015). While a lie is an intentional act, misspeaking is a product of inability or mistake. As the *Graves* court noted,

> [A]s any trial lawyer knows, there may be many explanations for differing descriptions of the same event. People have different perceptions of the same conversation that affect how and what they remember. Perhaps there was a misunderstanding of what was said; perhaps one person was distracted and did not fully or correctly hear the words uttered by the other person. People sometimes hear what they want to hear. It is unjust to make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth.

668 N.W.2d at 872. The question posed to Lucas presented a possibility of something other than a deliberate misrepresentation of the truth in the differing answers given by another witness and himself. Accordingly, counsel had no duty

to request redaction or object to the admission of his testimony in an administrative hearing.

## B. Prior Bad Acts Testimony.

Lucas next contends his trial counsel was ineffective in failing to object to and move to redact allegations of prior bad acts from his prior sworn testimony. Although such evidence may be admitted for other purposes, it cannot be admitted to prove a person's character and show the person acted in conformity therewith. Iowa R. Evid. 5.404(b). Even where prior-bad-acts evidence is both relevant and material to a legitimate issue in the case other than a general propensity to commit wrongful acts, the use of such evidence for impermissible purposes may result in reversible error. *See State v. Reynolds*, 765 N.W.2d 283, 293 (Iowa 2009).

Lucas alleges questions regarding his advising of investors, holding himself out as an investment advisor, and establishing an investment advisory firm are all prior bad acts that are unrelated to the criminal charges he was facing and were therefore inadmissible. The prosecutor referenced this testimony in closing argument as part of an "ocean of deception" Lucas engaged in. We preserve this matter for a possible postconviction-relief proceeding to allow the record to be further developed.

## C. Improper Argument in Closing Argument.

In his final claim of ineffective-assistance-of-counsel, Lucas contends his trial counsel was ineffective in failing to object to what he characterizes as improper argument by the prosecutor during closing argument. Specifically, he

objects to an argument the prosecutor made regarding why Lucas may have told Hanson the State had taken control of the Covenant funds when it had not. When presenting the jury with possible reasons, the prosecutor stated it might be "because the State does that sort of thing for free. When the State recovers individual's items that have been—or individual's property in this sort of a situation, they're not charging a percentage." Lucas argues the prosecutor engaged in misconduct by referring to the State's process of distributing investment fund money or the cost to investors of the State doing so, which are facts outside of the record.

The purpose of closing argument is to assist the jury in analyzing, evaluating, and applying the evidence. *State v. Melk*, 543 N.W.2d 297, 301 (Iowa 1995). An attorney can only argue a theory of the case from the evidence admitted at trial. *State v. Elliott*, 806 N.W.2d 660, 674 (Iowa 2011). While a prosecutor is afforded the latitude to draw conclusions and argue permissible inferences derived from the evidence in closing arguments, a prosecutor cannot create evidence. *State v. Shanahan*, 712 N.W.2d 121, 139 (Iowa 2006). The test is whether the comments are founded upon relevant evidence or a legitimate inference from the evidence. *State v. Martens*, 521 N.W.2d 768, 773 (Iowa 1994). Because the prosecutor's statement regarding the State's procedure for recovering money was not founded upon relevant evidence or a legitimate inference from the evidence, it was objectionable.

We have preserved Lucas's claim counsel was ineffective in failing to object to the prosecutor's closing argument for possible postconviction-relief

proceeding. Where more than one claim of ineffective assistance is raised on direct appeal, we can only dismiss the claim if the errors alleged do not cumulatively prejudice the defendant. *State v. Clay*, 824 N.W.2d 488, 501–02 (Iowa 2012). Accordingly, we also preserve this claim of ineffective assistance of counsel for a possible postconviction-relief proceeding.

## IV. SENTENCING.

In his final assignment of error, Lucas contends the district court considered improper evidence in sentencing him. We review sentencing decisions for the correction of errors at law. *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). However, where the sentence imposed is within the statutory limits, we will only overturn it for an abuse of discretion or a defect in the sentencing procedure, such as the consideration of an impermissible sentencing factor. *Id.*

Lucas was absent from the second day of trial, and a record of his absence was made outside the jury's presence. Lucas's trial counsel informed the court that although Lucas claimed his son had been in a car accident that morning, Lucas's mother had informed him Lucas planned to leave the country with his son.

At sentencing, Lucas denied that he tried to flee. The court stated, "You say that you didn't flee during the trial, which is directly contradicted by your own mother, who came to court to inform us that she watched you purchase a plane ticket from Chicago with the ultimate destination, I believe, [of] India. . . . And she sobbed in open court." Lucas's counsel then objected to the presentence

investigation report, which indicated Lucas was trying to flee the country, arguing there was no real evidence of that. The sentencing court responded, "[O]ther than that given by his mother in open court."

In sentencing Lucas, the court noted his crime did not involve violence, and therefore, consecutive sentences were not warranted. The court concluded a prison sentence was appropriate, however, finding Lucas had failed to take responsibility for his actions or show remorse. The court also noted Lucas demonstrated by his actions his intent to cause delay "at every point in the trial" before concluding, "You feel no remorse to these people whose money you used for yourself and for your wife at the time." The court then referenced Lucas's attempt to flee, stating:

> And then during the trial, you fled the jurisdiction and it was your mother who came into court to tell us what your plans were and that she watched you purchase a plane ticket out of the country and that she was worried about you and your son and said that you had not been raised that way.
> But your actions in absenting yourself from the trial, making plans to leave the country, and believing as I—you firmly believe that you could do whatever you wanted with that corporate money. To the detriment of that corporation, the money went to you. It did not go to the company or shareholders.
> And for that reason, I believe a prison sentence is warranted.

Lucas contends that although he failed to appear for the second day of trial, the record does not shows he committed the criminal offense of failure to appear. Therefore, he argues, it was improper for the court to consider it as a factor in sentencing.

When a defendant alleges the sentencing court improperly considered unproven crimes, the question is whether the record sufficiently establishes the

matters relied on. *State v. Longo*, 608 N.W.2d 471, 475 (Iowa 2000). An unproven or unprosecuted offense may only be considered if the facts before the court show the accused committed the offense or the defendant admits it. *State v. Gonzalez*, 582 N.W.2d 515, 516 (Iowa 1998).

While Lucas denies he committed the offense of failure to appear, there is ample credible evidence in the record to show he attempted to flee the jurisdiction to avoid responsibility for the offenses for which he was being tried. The court considered Lucas's attempt to flee the jurisdiction as one of several factors showing his failure to accept responsibility for his wrongdoing and show remorse, which our supreme court has held "is highly pertinent to evaluating his need for rehabilitation and his likelihood of reoffending." *See State v. Knight*, 701 N.W.2d 83, 88 (Iowa 2005); *see also United States v. French*, 719 F.3d 1002, 1009 (8th Cir. 2013) (affirming a sentence where the lower court considered the defendant's attempt to evade capture for two-and-one-half years, which demonstrated "a lack of remorse and an unwillingness to take responsibility for his actions").

Because the district court did not abuse its discretion in sentencing Lucas, we affirm.

**AFFIRMED.**